UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LISA POWLEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TIAA-CREF INDIVIDUAL & INSTITUTIONAL SERVICES, LLC (doing business through TIAA BROKERAGE DIVISION) and TIAA Trust, N.A.,<br><br>Defendants. | § § § § § § § § § § § § § § § § | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Lisa Powlen ("Plaintiff"), by and through her undersigned counsel, brings this class action against TIAA-CREF Individual & Institutional Services, LLC, doing business through its TIAA Brokerage division ("TIAA Brokerage") and TIAA Trust, N.A. ("TIAA Trust") (collectively "TIAA" or "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) contracts between the parties and other documents in Plaintiff's possession; (b) public documents created and distributed by Defendants; and (c) publicly available information concerning Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Plaintiff brings this class action on behalf of TIAA's customers and account holders to recover damages arising from Defendants' wrongful conduct related to TIAA's automatic Bank Deposit Sweep Program ("BD Sweep Program"). During the relevant period, TIAA Brokerage offered brokerage and retirement-account services nationwide, including to Plaintiff. TIAA automatically enrolled individual retirement accounts ("IRAs"), including

Plaintiff's account, in the BD Sweep Program, which swept uninvested cash into FDIC-insured bank deposit accounts even though a higher-yielding money market fund option was available for Plaintiff's account through TIAA's sweep platform. The BD Sweep Program is a recognized brokerage sweep program that automatically transfers uninvested cash to a designated cash vehicle.

2. Under the BD Sweep Program, TIAA Brokerage swept customer cash into bank deposit accounts selected or designated through its platform, while the applicable banks received and administered customer cash. The BD Sweep Program is highly lucrative for TIAA Brokerage and the applicable banks because it provides access to stable customer deposits that can be used for lending, investment, and other banking activities, and because the spread between what a bank pays on deposits and what it earns on loans, investments, and other assets generates economic value. In exchange for this access to restricted customer cash, TIAA expressly promised in its agreements with its IRA customers and Plaintiff that any deposits of uninvested cash balances would "bear a reasonable rate of interest," and that interest rates would fluctuate. Yet the bank-sweep rate credited to Plaintiff and the Class remained materially below contemporaneous short-term figures and TIAA's own higher managed, overflow, and money-market rates, while remaining static and relatively nonresponsive as short-term rates rose—failing to constitute a "reasonable rate of interest" by any objective measure. The difference, or "spread," between the minuscule rates paid to customers and the returns earned from the use of customers' cash resulted in windfall and impermissible profits for Defendants. Defendants' financial incentives and undisclosed spread caused Plaintiff and the Class to receive less interest than the agreements and implied covenant required.

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005. There are at least 100 members in the proposed Class (defined below), the aggregated

claims of the individual Class members exceed $5,000,000, exclusive of interest and costs, and at least one or more members of the proposed Class is a citizen of a different state than at least one Defendant.

4. This Court has personal jurisdiction over Defendants because, during the relevant time period, Defendants had offices in, did sufficient business in, had sufficient contacts with, and intentionally availed themselves of the laws and markets of this District through the promotion, sale, marketing, distribution, and operation of their products and services in this District, and many of the acts and practices complained of herein occurred in substantial part in New York.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants transacted business in this District and a substantial part of the acts and practices complained of herein occurred in this District.

## III. PARTIES

### A. Plaintiff

6. At all times material hereto, Plaintiff Lisa Powlen was an Indiana citizen who now resides in Florida. She maintains a retirement brokerage account through TIAA Brokerage, which is governed by, among other documents, a TIAA Roth IRA Account Agreement, which incorporates by reference the Individual Retirement Account Trust Agreement (together, the "Account Agreement" or "Agreement"). Ms. Powlen's cash balances in her TIAA Brokerage account were, at times, automatically swept into the BD Sweep Program even though a higher-yielding money market fund option was available for her account, and she received unreasonably low interest on those deposits.

### B. Defendants

7. Defendant TIAA-CREF Individual & Institutional Services, LLC ("TC Services") is the entity through which TIAA Brokerage provides brokerage services, with its principal office at 730 Third Avenue, New York, New York 10017. TIAA Brokerage is a

division of TC Services and the product provider for the Bank Sweep Product. The Customer Account Agreement identifies the brokerage accounts as provided by TIAA Brokerage and carried by Pershing LLC. TIAA Brokerage offered and administered the BD Sweep Program, communicated the applicable rates and disclosures, and exercised operational control over the Sweep Vehicles, defaults, and other options made available through its platform.

8. Defendant TIAA Trust, N.A. is a trust and investment management subsidiary of TIAA Brokerage, headquartered at 8500 Andrew Carnegie Boulevard, Charlotte, North Carolina. Since late 2022, TIAA Trust has served as the Trustee of Plaintiff's Roth IRA account under the Trust Agreement for Directed Roth Individual Retirement Accounts. TIAA Trust received Plaintiff's swept retirement cash, paid the interest credited, and earned net income from the difference between the amount it paid on deposits and the income it earned on investments.

## IV. FACTUAL BACKGROUND

### A. Background on the Program

9. A cash sweep feature automatically transfers available uninvested cash in a brokerage account at the end of each business day to a money market fund or a bank sweep deposit account, if applicable, and facilitates redemption or transfer of cash back to the brokerage account to cover purchases and other debits. TIAA's Customer Account Agreement describes that feature and calls the available fund or deposit account a "Sweep Product."[1]

10. Federal securities regulations use the same basic concept. A "sweep program" is a service provided by a broker or dealer that offers customers the option to automatically transfer free credit balances in a securities account to a money market mutual fund described in 17 C.F.R. § 270.2a-7 or to an account at a bank whose deposits are insured by the Federal

---

[1] *See* TIAA Brokerage Account Customer Agreement (TIAA IRA) (effective May 2024) (the "Agreement").

Deposit Insurance Corporation ("FDIC").[2] The definition confirms that automatic movement of uninvested brokerage cash into a bank deposit or money-market vehicle is a recognized brokerage service, not an ordinary securities purchase.

11. Sweep deposits play an important role as a capital source for banks, enabling banks to utilize cash deposits for various corporate purposes. In turn, banks pay broker-dealers as intermediaries for aggregating and placing the deposits with the banks. The difference (*i.e.*, "spread") between the interest rates paid to the customers of broker-dealers on the sweep accounts and the interest rate received from banks for those deposits is commonly referred to and reported in financial statements as net interest income and contributes to the broker-dealer's reported net interest margin.

12. Customers with brokerage, retirement, and advisory accounts generally hold a low percentage of their combined assets in cash, and these balances tend to remain untouched for long periods of time. Because of the "stickiness" (also known as stability or duration) of deposit accounts, swept deposits are a valuable deposit franchise for brokerage businesses.

13. The Account Agreement provides that available Sweep Vehicles vary by account type. It directs TIAA to use the vehicle indicated on the Account Application, or the default vehicle if none is indicated, and states that a single available vehicle may be used for all eligible uninvested cash. For Plaintiff's Roth IRA account, TIAA automatically and intentionally enrolled her in the BD Sweep Program as the default Sweep Vehicle even though a higher-yielding money market fund option was available through the platform.[3]

14. The Account Agreement expressly contemplates both money market funds and bank sweep deposit accounts. It describes money market mutual funds as SEC-registered securities and bank sweep options as deposit accounts held at one or more banks. Bank deposits

---

[2] *See* 17 C.F.R. § 240.15c3-3(a)(17).

[3] n.1

pay interest under the applicable bank sweep disclosure, and rates may fluctuate and vary among banks.[4]

15. Accordingly, under the BD Sweep Program, Defendants automatically swept eligible clients' cash balances into interest-bearing deposit accounts ("Deposit Accounts") with a network of affiliated and unaffiliated bank partners selected by Defendants ("Program Banks"). The TIAA Sweep Product Terms and Conditions and the TIAA Interest Rate Disclosure (the "Sweep Disclosure Documents") are the Program Documents (collectively, "Program Documents").

16. Plaintiff's signed Enrollment Form for a TIAA IRA for Traditional, Roth, or SEP Account incorporates by reference the TIAA Directed Trust Agreement and Disclosure Statement (the "Trust Agreement").[5] Together with the Account Agreement and Customer Account Agreement, these documents form Plaintiff's contract with Defendants (the "Contract").

17. Critically, Plaintiff's Contract contains an express promise that the interest rate paid on uninvested cash bear a reasonable interest rate. The Trust Agreement provides that "[t]he Grantor authorizes the Trustee to deposit uninvested cash balances in demand deposits, savings deposits, or similar accounts maintained in the commercial or savings department of any bank or savings association, the deposits of which are insured by the Federal Deposit Insurance Corporation ('FDIC'), including those of the Trustee or any bank or savings association that is an affiliate of the Trustee; *provided that any such deposits bear a reasonable rate of interest.*" (emphasis added).[6]

---

[4] *See id.*

[5] Current version available at https://www.tiaa.org/public/pdf/i/IRA_Directed_Trust_Agreement_Roth_DAO.pdf (last accessed September 1, 2026).

[6] n.5

18. This contractual requirement—that TIAA pay a "reasonable rate of interest" on uninvested cash—is not merely aspirational; it is an express condition that authorizes the deposit of Plaintiff's retirement cash with TIAA's affiliated banks. TIAA's authority to sweep Plaintiff's uninvested cash into FDIC-insured deposit accounts is expressly contingent upon those deposits bearing a reasonable rate of interest. If the deposits do not bear a reasonable rate of interest, then TIAA lacks contractual authority to place Plaintiff's cash in those accounts and has breached its express contractual obligations.

19. The Contract's "reasonable rate of interest" requirement is consistent with the regulatory framework governing retirement accounts. Under 26 U.S.C. § 4975(d)(4), the statutory exemption permitting the sweep of IRA assets to affiliated bank deposits applies only if those deposits "bear a reasonable interest rate." Similarly, Section 408 of ERISA exempts interested-party transactions involving the investment of retirement account assets in bank deposits only if they "bear a reasonable interest rate." The Contract's express contractual promise mirrors these statutory requirements and incorporates them into the parties' bargain.

20. Sweep deposits provide banks with a source of funding that can be deployed in lending, investment, and other banking activities. TIAA's sweep terms state that affiliate bank Everbank uses deposits in the omnibus accounts to support investment, lending, and other activities, and that the deposits may be obtained at a price below alternative funding sources.[7]

21. The economics of the banks in the BD Sweep Program turn on the spread between the interest they pay on omnibus deposits and the interest or other income they earn on loans, investments, and other assets. TIAA's 2022 terms expressly describe that difference as part of the Bank's profitability; the 2025 terms likewise describe a stable source of funds and a price potentially below alternatives. At no point did Defendants disclose the spread's magnitude or how it affected Plaintiff's credited sweep rate.

---

[7] *See* TIAA, FSB Bank Sweep Product Terms and Conditions (2022)

22. The TIAA sweep arrangements used omnibus accounts and recorded each customer's beneficial interest through the brokerage and clearing records rather than requiring the customer to transact directly with the Bank. The structure allowed Defendants to aggregate customer cash at scale while customers received only the rate shown in their statements and disclosures.

23. The sweep feature was an operational program that was highly lucrative. TIAA Brokerage controlled or participated in the platform's menu, designation, and rate communications, while the applicable Bank retained the formal authority described in the terms to determine the rate paid on deposits.[8]

24. The TIAA Sweep Product Terms and Conditions identified Everbank as the Bank, allowed it to receive eligible balances up to a stated maximum, and provided that excess balances could be placed through the Overflow Bank Sweep Product ("LIDS"). Funds earned interest accrued daily on the balance, and the amount of interest and annual percentage yield were reported on brokerage statements. TIAA Brokerage and Everbank were separate but affiliated companies. TIAA retains a non-controlling interest in Everbank. TIAA's interest-rate disclosure explicitly stated that TIAA FSB earned net income from the difference between the amount it paid on deposits and the income it earned on investments, and that TIAA affiliates received compensation in connection with the Bank Sweep Products.[9][10]

25. Despite the existence of alternative higher-yielding sweep vehicles, TIAA automatically enrolled and kept Plaintiff's eligible account in the BD Sweep Program and left her cash in the lower-yield TIAA Brokerage Sweep Product.

---

[8] *See id.*

[9] *See id.*

[10] *See* TIAA Interest Rate Disclosure.

26. This is not accidental. The disclosures state that "TIAA Brokerage may earn a higher fee if you participate in the Bank Sweep Product than if you invest in other sweep options such as money market funds."[11] TIAA used its discretion over Plaintiff's account opening to automatically enroll her and keep her in the lower-yielding Sweep Program despite her account being eligible for enrollment in the higher-yielding money market fund sweep vehicle.

27. Customers did not negotiate the rate credited to their sweep balances with TIAA FSB or its successor EverBank. Indeed, customers had no direct relationship with the Program Banks and were required to obtain any information from Defendants. Defendants exercised full discretion and control over cash deposited by customers, including selecting which banks the swept cash was sent to, and determining the interest rates customers would receive. TIAA Brokerage transmitted, recorded, and reported the sweep activity, while the Bank paid interest under the applicable sweep disclosure. Plaintiff and the Class depended on the Program documents and statements to understand the rate and amount credited to their cash.

28. TIAA's interest-rate disclosures stated that bank deposit accounts pay interest under the applicable bank-deposit option's terms and that rates "will fluctuate and are subject to change at any time." The disclosures also stated that displayed yields reflected recent yields and were subject to change and availability. In this context, reasonable consumers would understand the term "fluctuate"—a term commonly used in market and economic contexts—to correspond to macroeconomic factors affecting businesses as measured by factors such as GDP, inflation, unemployment, and interest rates, as opposed to the Defendants' pecuniary whims.

---

[11] n.5.

### B. TIAA Paid Below-Market and Unreasonably Low Rates of Interest Under the Program

29. The definition of "reasonable" as it appears in the Merriam-Webster dictionary is as follows: "being in accordance with reason, fairness, duty, or prudence"; "of an appropriate degree or kind"; or "supported or justified by fact or circumstance."[12]

30. A reasonable rate of interest is, at bottom, the rate that would result in a competitive market under fair market valuation conditions, *i.e.*, a rate parties would agree to in an arm's-length transaction where neither party was able to exert market power over the other.

31. "Fair market value" ordinarily represents "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction."[13] Similarly, "fair market value" is defined by the U.S. Internal Revenue Service ("IRS") as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts."[14]

32. As context for the factfinder, the U.S. Department of Labor, in a 2003 letter granting an exemption from Sections 408(a) and 4975(c)(2), has defined a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short-term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[15]

---

[12] *Reasonable*, Merriam-Webster, https://www.merriam-webster.com/dictionary/reasonable (last visited on September 1, 2026).

[13] FAIR MARKET VALUE, Black's Law Dictionary (11th ed. 2019).

[14] U.S. Internal Revenue Service, Publication 561, Determining the Value of Donated Property (Dec. 2025), https://www.irs.gov/publications/p561.

[15] Prohibited Transaction Exemption No. 2003-11, §III(f), 68 Fed. Reg. 34,648 (June 10, 2003), https://www.federalregister.gov/documents/2003/06/10/03-14594/grant-of-individual-exemptions-deutsche-bank-ag.

33. Consistent with these commonsense definitions, a competitive, varying, market-based, and reasonable sweep rate is one that takes into account market rates commonly associated with bank cash funding such as short-term instruments like repurchase (or reverse repo) agreements, short-dated Certificates of Deposit, U.S. Department of the Treasury ("Treasury") bills, wholesale and brokered deposits, government money market funds and short-term interest reference rates like the Federal Funds Rate ("FFR"), Secured Overnight Financing Rate ("SOFR"), and/or the London Interbank Offered Rate. These market short-term interest rates are highly correlated, as shown in the graph below:




34. By a variety of objective measures, the Program paid far below-market, static, and unreasonable interest rates throughout the relevant time period. Indeed, although the Sweep Disclosure Documents state that interest rates will "fluctuate," the rates paid to Plaintiff and the Class were not competitive, not reasonable, not variable, and failed to vary with historical increases in the short-term interest rate environment, such as the FFR.

35. The Program paid substantially below-market interest rates throughout the relevant time period, staying essentially flat over time. For example, upon information and belief, below are the rates that TIAA paid through the Program at times during the relevant period:

| Date / Period | Cash Sweep Interest Rate |
|---|---|
| March 1 – March 31, 2022 | 0.005% |
| As of May 13, 2022 (rate disclosure) | 0.115% |
| June 1 – June 30, 2022 | 0.115% |
| September 1 – September 30, 2022 | 0.34% |
| December 1 – December 31, 2022 | 0.75% |
| January 3 – January 31, 2023 | 0.85% |
| February 1 – February 28, 2023 | 0.85% |
| As of March 1, 2023 (rate disclosure) | 0.892% |
| March 1 – March 31, 2023 | 0.90% |
| June 1 – June 30, 2023 | 1.00% |
| September 1 – September 30, 2023 | 1.05% |
| December 1 – December 31, 2023 | 1.05% |
| March 1 – March 31, 2024 | 1.05% |
| As of May 15, 2024 (rate disclosure) | 1.05% |
| June 1 – June 30, 2024 | 1.05% |
| September 1 – September 30, 2024 | 1.05% |
| December 1 – December 31, 2024 | 0.90% |
| As of January 15, 2025 (rate disclosure) | 0.85% |
| March 1 – March 31, 2025 | 0.85% |
| June 1 – June 30, 2025 | 0.86% |
| September 1 – September 30, 2025 | 0.85% |
| December 1 – December 31, 2025 | 0.75% |
| As of July 13, 2026 (rate disclosure) | 0.70% |

36. Accordingly, rates under the Program remained far below market. Specifically, the FFR, SOFR, Treasury-bill and reverse-repo rates, competitor rates, and TIAA's own managed and overflow rates are probative because they show available short-term cash returns, opportunity cost, and whether TIAA's rate fluctuated in any capacity in accordance with prevailing conditions. The FFR, SOFR, Treasury-bill and reverse-repo rates, competitor rates, and TIAA's own displayed rates are relevant contemporaneous indicators of short-term cash conditions. These comparisons matter because TIAA described rates as variable, retained discretion over sweep options and rate administration, and disclosed that available Sweep Vehicles could carry different rates of return.

37. During the same period, in contrast, market rates for similar products and short-term interest rates increased significantly.

**1. Federal Funds Rates**

38. The FFR is the unsecured overnight rate at which depository institutions lend reserve balances to one another, and is calculated by the Federal Reserve as the volume-weighted median interest rate charged by banks on overnight lending. Changes in the FFR quickly affect interest rates that banks and other lenders charge on short-term loans. Thus, when the FFR increases, market-based cash investments will increase as well. The FFR is an important administered policy benchmark referenced in many wholesale funding arrangements, including cash sweep programs. In short, the FFR is one of the most important factors driving the global economy.

39. Defendants have failed to pass through to their customers the increases in the FFR since at least early 2022. For example, between March 2022 and July 2023, the Federal Reserve increased the Federal Funds target range 11 times. The rates paid under the Program changed minimally—rising only from approximately 0.115% in or around May 2022 to approximately 1% in May 2023 for accounts like Plaintiff's—far below any market benchmark. Indeed, the TIAA rate history captures the resulting environment: by June 2023, the FFR was 5.08% while the sweep rate was 1.00%, and the disparity persisted as the FFR remained above 5% through mid-2024. The rates paid under the Program consistently have been and remain unreasonably low and uncompetitive relative to FFRs, even during the ultra-low-interest rate environment resulting from the COVID-19 pandemic (early 2020 through early 2022).

40. Plaintiff here does not allege that each customer rate had to move one-for-one with each policy change. Rather, Plaintiff alleges that the repeated and sustained divergence supports the inference that TIAA's disclosed variable rate was relatively nonresponsive.

**2. SOFR**

41. In addition to the FFR, the rates paid under the Program have been and remain significantly below several other objective *indicia* of reasonableness, including SOFRs and Treasury bill rates.

42. The SOFR measures the cost of borrowing cash overnight collateralized by Treasury securities and is calculated from a very large volume of actual repurchase transactions.[16] It is widely regarded as the best measure of the marginal cost of secured overnight funding in U.S. dollar markets. Importantly, the SOFR is a market rate that Federal Reserve publications emphasize is the most representative measure of short-term funding conditions precisely because it is grounded in actual trades, rather than quotes or estimates.[17]

43. The rates paid under the Program consistently have been and remain unreasonably low and uncompetitive relative to the SOFRs.

44. Moreover, the sharp increases in the effective FFR and the SOFR beginning in 2022 and continuing through the present produced little to no increase in the rates paid under the Program. Indeed, as discussed above, the rates paid by Defendants barely changed, if at all, even while short-term interest rate conditions improved drastically during the relevant time period. In addition to the FFR discussed above, the rates paid under the Program have been and remain significantly below several other objective *indicia* of reasonableness, including, by way of example: (a) SOFRs, including the 180-day average SOFR currently at 3.67%,[18] as of July 11, 2026; (b) Treasury bill rates, including the three-month and one-year rates currently at 3.70% and 3.83%, respectively, as of June 25, 2026;[19] and (c) the overnight interest rate at which the Federal Reserve repurchases securities from private banks (*i.e.*, the "repo" rate), which

---

[16] Federal Reserve Bank of New York, *Secured Overnight Financing Rate*, https://www.newyorkfed.org/markets/reference-rates/sofr (last visited September 1, 2026).

[17] Federal Reserve Bank of New York, *An Updated User's Guide to SOFR* (Feb. 2021), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/users-guide-to-sofr2021-update.pdf.

[18] SOFR Academy, *Market Data*, https://sofracademy.com/current-sofr-rates/ (last visited September 1, 2026).

[19] Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis* (July 29, 2026), https://fred.stlouisfed.org/series/DTB3; Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis* (July 29, 2026), https://fred.stlouisfed.org/series/DTB1YR.

is currently 3.50%, as of June 25, 2026.[20] Short-term interest rates for these other federal financial instruments experienced steep rate increases from 2022 to the present.

45. For purposes of illustration, the following charts depict the one-year and three-month Treasury bill rates between 2017 and today:







46. The repo rate similarly increased together with the FFR beginning in 2022. For purposes of illustration, the below graph depicts the repo rates between 2017 and today.




[20] Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate* (July 30, 2026), https://fred.stlouisfed.org/series/RRPONTSYAWARD.

47. As depicted above, like other short-term interest rate benchmarks, the repo rate increased alongside the FFR beginning in 2022.

48. The movement of SOFR and other short-term benchmarks beginning in 2022 provides further context for the allegation that TIAA's rate was relatively nonresponsive. The relevant inquiry is whether TIAA exercised its discretion consistently with the disclosed variable-rate framework, not whether the account rate matched SOFR day for day. As demonstrated, TIAA exercised its discretion to suppress the interest rates that customers could receive through the Program, while retaining the crux of the rising rates for its own pecuniary whims.

**3. Historical TIAA Sweep Rates**

49. TIAA's historical rate chart and archived disclosures reflect the rates alleged above. The rates demonstrated the bank sweep was significantly lower than other TIAA sweep categories, including managed and overflow options, which enjoyed materially higher interest rates on their deposits.[21] The persistence of this spread supports the allegation that the rate was not reasonable, and did not respond proportionately to market conditions or to even TIAA's own offerings.

50. For example, TIAA's August 2023 rate materials reported the Sweep Vehicle at 1.05%, while the LIDS overflow option for accounts and the managed sweep were each listed at 2.53%.

51. Similarly, on January 15, 2025, TIAA listed the sweep interest rate at 0.85%, the managed sweep at 3.93%, LIDS for accounts at 1.44%, and LIDS for managed accounts at 1.74%.

[21] *See, e.g.,* TIAA, Cash Sweep Rates (Jan. 15, 2025), showing TBS at 0.85%, TMS at 3.93% (4.01% APY), LIDS for self-directed accounts at 1.44%, and LIDS for managed accounts at 1.74%.

52. These internal comparisons are especially probative because they hold the TIAA platform, administrative framework, and general cash-sweep function relatively constant.

53. TIAA's own documents thus provide a basis to compare the bank-sweep rate with other TIAA cash options and show that a higher-yielding money market fund option was available for eligible accounts. Plaintiff alleges that TIAA automatically enrolled her in the lower-yield BD Sweep Program despite that available alternative.

54. TIAA's disclosures also show that the applicable options and participating banks could change over time. That flexibility did not eliminate the duty to administer the contractual rate disclosures in good faith. TIAA's Form CRS states that TIAA and its affiliates receive higher compensation from certain TIAA-affiliated products and certain third-party bank deposits than from other third-party products, and that TC Services receives a portion of the yield paid by third parties on swept cash. It further discloses an incentive to offer sweep options that compensate TC Services more even if another available option generates a higher yield for the customer. This evidences TIAA's compensation structure and motive in utilizing its discretion to automatically enroll Plaintiff in a lower-yielding sweep vehicle for its own interests despite the existence of higher-yielding alternatives.

55. Accordingly, Plaintiff and similarly situated individuals were harmed by the fact that TIAA maintained a sweep rate that changed only modestly and remained materially below contemporaneous short-term benchmarks and TIAA's higher displayed alternatives.

**4. Rates Paid by Competitors**

56. Competitor sweep programs are governed by different contractual arrangements and business structures, many of which may also involve structural, rate-depressing conflicts of interest. Nevertheless, sweep rates offered by other financial institutions highlight the unreasonableness of Defendants' Program, and demonstrate that Defendants stand out among the worst of the worst in an already uncompetitive industry.

57. While every cash sweep program is unique, the disparity in yield between the Program and those of Defendants' competitors who eschew related-party sweep transactions illustrates that Defendants operated the Program to serve their own interests rather than the interests of their customers. For example, Fidelity's FDIC-Insured Deposit Sweep Program currently pays an interest rate of 1.82%; The Vanguard Group, Inc.'s ("Vanguard") FDIC-insured Cash Deposit Program currently pays an annual percentage yield of 1.75%; and the FDIC-insured Bank Sweep Feature of Robert W. Baird & Co. Inc.'s ("Baird") Cash Sweep Program currently pays interest rates ranging from 0.94% to 1.98%.

58. Fidelity also offers to automatically sweep customers' cash into a money market mutual fund with a current seven-day yield of 3.30%, as of early July 2026. Vanguard offers to automatically sweep customers' cash into one of five money market mutual funds with current seven-day yields ranging from 1.65% to 3.64%, and Baird automatically sweeps certain eligible customers into a money market mutual fund with a current seven-day yield of 3.51%.

59. Like Fidelity, Vanguard, and Baird, Defendants could have automatically swept cash to banks that pay market rates, or automatically enrolled all eligible customers to sweep to a money market mutual fund. Money market mutual funds are strictly regulated by the SEC and can only be sold pursuant to prospectuses, which disclose the sponsor's profits on the use of investor cash, in contrast to Defendants' Program, which is a black box, and does not disclose the significant spread, for example, between the rates paid on cash and the FFR or rates paid by other competitors' lending businesses.

60. Through any reasonable means of interpretation and construction, Defendants failed to pay any "reasonable" rate to their customers through the Program. Making matters worse, the disclosures identified the existence of compensation and conflicts, but did not quantify the spread, explain how the customer rate was derived, or show the opportunity cost of keeping cash in the lower-yield vehicle. That omission is alleged as evidence of bad-faith exercise of discretion and damages.

### C. TIAA Defendants Breached Their Contractual Obligations and the Implied Covenant Related to the Program

61. Defendants breached express and implied contractual obligations by failing to administer the Sweep Program and credit interest in accordance with the Program documents and by failing to pay a "reasonable rate of interest" as expressly required by the Contract. They also exercised contractual discretion over Sweep Vehicles, bank allocations, and rate administration in a manner that deprived Plaintiff and the Class of interest they were entitled to receive under those documents.

62. The Contract and Interest Rate Disclosure also stated that bank deposits paid interest under the applicable sweep disclosure and that interest rates would fluctuate and be subject to change. Read together, these provisions required Defendants to apply the applicable sweep terms and represented that the rate would vary in accordance with those terms and in a reasonable manner, rather than permitting TIAA to maintain the sweep rate at an artificially low level based solely on its unilateral discretion.

63. TIAA breached its duty by crediting Plaintiff's swept cash at rates that were not reasonable by any objective measure—rates that were substantially below the FFR, SOFR, Treasury-bill rates, competitor rates, and TIAA's own managed and overflow alternatives. Indeed, at times during the relevant period, the sweep rate was approximately 1.00% while the FFR exceeded 5%, demonstrating a manifest failure to pay a reasonable rate of interest as the Custodial Agreement required.

64. Defendants' rates were not merely lower than a chosen benchmark; they were relatively nonresponsive to the sharp increase and later persistence of different market rates. The pattern is corroborated by the FFR, SOFR, Treasury-bill and reverse-repo rates, competitor rates, and TIAA's own managed and overflow comparisons. Those comparisons are evidentiary measures of TIAA's rate-suppression conduct and discretion, as well as a measure of responsiveness, opportunity cost, causation, and damages.

65. Defendants' decision to maintain Plaintiff's cash in the lower-yield bank sweep while displaying materially higher managed, overflow, and money-market rates support the inference that Defendants retained discretion to determine the option available to Plaintiff and exercised that discretion to their financial benefit.

66. Despite Plaintiff's account type being eligible for enrollment into different and higher-yielding Sweep Vehicles, TIAA nevertheless automatically enrolled her eligible account in the BD Sweep Program/default bank-deposit vehicle even though a higher-yielding money-market fund option was available under the governing terms and TIAA's platform. TIAA failed to exercise its discretion in good faith in order to suppress the rate credited to Plaintiff and other similarly situated customers.

67. Although the documents disclosed that the Bank used deposits to support lending and investment activities and that TIAA Brokerage or its affiliates could receive compensation, they did not disclose the magnitude of the Bank's spread or the compensation associated with each option. As a result, Plaintiff could not evaluate the economic consequences of Defendants' choices or determine whether those choices reduced the interest credited to her retirement cash. The absence of this information is particularly significant because it prevented Plaintiff from assessing whether Defendants exercised their contractual discretion in good faith and whether their choices complied with the contractual obligations alleged under both contract theories.

68. Defendants owed Plaintiff and the Class the implied covenant of good faith and fair dealing, which required them to exercise contractual discretion consistently with the purposes of the sweep arrangement and not to use discretion to defeat the benefit of the bargain.

69. The Contract vested Defendants with discretion over the operational administration of the Sweep Program, including which Sweep Vehicles were available or designated for an account, how cash was placed, and how changing rates and bank allocations

were administered. Defendants were not free to use that discretion arbitrarily or to make the variable-rate language illusory.

70. Defendants breached the implied covenant by exercising their contractual discretion in bad faith to suppress and maintain an artificially low, relatively nonresponsive rate while the Bank used customer deposits as stable funding, short-term rates and TIAA's other sweep categories increased, and TIAA, its affiliates, the applicable Bank, and service providers retained or allocated the resulting economic value. Defendants further breached the implied covenant by automatically enrolling Plaintiff and Class members in the lower-yield BD Sweep Program, despite the availability of higher-yielding money market fund options for eligible accounts, thereby depriving Plaintiff and Class members of the benefit of their contractual right to have their retirement cash managed in accordance with the agreements' terms and purposes.

71. This bad-faith use of discretion was directly tied to TIAA's financial incentives which disclosed that compensation may be higher for certain bank-deposit products than for other products and that TC Services receives a portion of third parties' yield on swept cash. Those incentives, together with the undisclosed spread magnitude, motivated Defendants to keep the rate low during the periods in which the respective arrangements applied.

72. Defendants' conduct frustrated Plaintiff's and the Class's objectively reasonable expectations that a rate expressly described as variable and subject to change would be administered in a manner responsive to relevant short-term cash-rate conditions and that TIAA would not use the BD Sweep Program default to suppress returns when a higher-yielding money market fund option was available. Accordingly, Defendants' conduct deprived Plaintiff and the Class of the benefit of their contractual arrangement.

73. Defendants' conduct was common to the Class because it arose from standardized account agreements, sweep terms, rate disclosures, platform defaults, bank relationships, compensation arrangements, and rate-setting practices, including automatic

enrollment in the BD Sweep Program when higher-yielding money-market alternatives were available for eligible accounts. The common rate history and market comparisons provide classwide evidence of the conditions against which the rate was administered.

74. Plaintiff and the Class were damaged by receiving less interest than they would have received had Defendants administered the variable-rate arrangement and their discretion in good faith, including by offering or designating the higher-yielding money-market option available through TIAA's platform rather than automatically placing cash in the lower-yield BD Sweep Program, and by paying a reasonable rate of interest as the Contract expressly required.

## V. CLASS ACTION ALLEGATIONS

75. Plaintiff brings this action against Defendants as a class action pursuant to Rule 23(a) and (b)(1)-(3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

> All individual retirement account customers of Defendants who had cash deposits or balances in Defendants' Bank Deposit Sweep Programs within the applicable statute of limitations (the "Class").

76. Excluded from the Class are Defendants, their affiliates, officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any person whose claim is subject to a materially different contractual arrangement.

77. Plaintiff reserves the right to amend the Class definition upon conducting further investigation or discovery.

78. **Numerosity.** The members of the Class are so numerous that their individual joinder is impracticable. While the exact number of members of the Class can only be determined by appropriate discovery, Plaintiff believes that the members of the Class number in the many thousands, and are geographically dispersed.

79. **Commonality.** There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members

of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Fed. R. Civ. P. 23(c)(4), include the following:

1. whether the Contract, sweep terms, and rate disclosures governed the interest credited to Plaintiff and the Class;

2. whether Defendants breached those express contractual terms by administering or crediting the bank-sweep rate in a manner inconsistent with the disclosed variable-rate and applicable-disclosure arrangement;

3. whether Defendants breached the Contract's express requirement that deposits of uninvested cash bear a "reasonable rate of interest";

4. whether Defendants breached the implied covenant by automatically enrolling Plaintiff and Class members in the BD Sweep Program, suppressing the rate, and exercising discretion over Sweep Vehicles, bank allocations, rate administration, and related economic arrangements in bad faith;

5. whether the bank-sweep rate was relatively nonresponsive to contemporaneous FFR, SOFR, Treasury-bill, reverse-repo, and competitor-rate conditions and materially lower than TIAA's displayed managed and overflow rates;

6. whether the Bank's use of swept deposits as stable funding, Defendants' compensation and affiliation interests, and the undisclosed magnitude of the spread bear on the implied-covenant claim and common damages;

7. whether and to what extent Plaintiff and the other Class members sustained damages and the proper measure of lost interest and other contract damages, including through common account records, rate histories, and appropriate market or internal comparators;

8. whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

9. whether and to what extent Plaintiff and the other Class members are entitled to attorneys' fees, costs, pre- and post-judgment interest, or other relief available under the two causes of action.

80. **Typicality.** Plaintiff's claims are typical of members of the Class's claims because Plaintiff's cash deposits were subject to the Program, and, therefore, Plaintiff's claims, and those of all other members of the Class, arose from the same wrongful conduct by Defendants alleged herein.

81. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel experienced and competent in complex class action litigation. Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

82. **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Class to individually seek redress for Defendants' wrongful conduct.

83. **Final Declaratory or Injunctive Relief.** Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making declaratory or corresponding injunctive relief appropriate for the Class as a whole, to the extent available.

## VI. CLAIMS ALLEGED

**FIRST CAUSE OF ACTION**
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

84. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-83 above.

85. Plaintiff and members of the Class were parties to the Contract with Defendants. The Contract, in addition to the Sweep Disclosure Documents set forth the contractual terms and conditions governing Plaintiff's retirement account and the BD Sweep Program.

86. The Contract expressly provides that "[t]he Grantor authorizes the Trustee to deposit uninvested cash balances in demand deposits, savings deposits, or similar accounts maintained in the commercial or savings department of any bank or savings association, the deposits of which are insured by the Federal Deposit Insurance Corporation ('FDIC'), including those of the Trustee or any bank or savings association that is an affiliate of the Trustee; provided that any such deposits bear a reasonable rate of interest."

87. This contractual requirement—that TIAA pay a "reasonable rate of interest" on uninvested cash—is an express condition that authorizes the deposit of Plaintiff's retirement cash with TIAA's affiliated banks. TIAA's authority to sweep Plaintiff's uninvested cash into FDIC-insured deposit accounts, including those of the Trustee or its affiliates, is expressly contingent upon those deposits bearing a reasonable rate of interest.

88. Defendants breached this express contractual requirement by crediting Plaintiff's and the Class's swept cash at rates that were not reasonable by any objective measure. The rates paid under the Program were substantially below the FFR, SOFR, Treasury-bill rates, competitor rates, and TIAA's own managed and overflow alternatives. At times during the relevant period, the sweep rate was approximately or lower than 1.00% while the FFR exceeded 5%, and the disparity persisted even as TIAA displayed materially higher rates for its managed, overflow, and money-market alternatives.

89. The Contract's "reasonable rate of interest" requirement is consistent with the regulatory framework governing retirement accounts. Under 26 U.S.C. § 4975(d)(4), the statutory exemption permitting the sweep of IRA assets to affiliated bank deposits applies only if those deposits "bear a reasonable interest rate." Similarly, Section 408 of ERISA exempts interested-party transactions involving the investment of retirement account assets in bank deposits only if they "bear a reasonable interest rate." TIAA's failure to pay a reasonable rate of interest not only breached the express terms of the Contract but also rendered the cash sweeps unauthorized and prohibited transactions under applicable law.

90. As a direct and proximate result of Defendants' breach of contract, Plaintiff and the Class sustained damages, including lost interest and other contract damages. Those damages may be determined from common rate histories, account records, and appropriate market, competitor, and TIAA internal comparisons, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Class**

91. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-83 above.

92. Plaintiff and members of the Class were parties to the Contract with Defendants. The Contract, in addition to the Sweep Disclosure Documents set forth the contractual terms and conditions governing Plaintiff's retirement account and the BD Sweep Program.

93. The Program documents vested Defendants with discretion over the operational administration of the Sweep Program, including which Sweep Vehicles were available or designated for an account, how eligible cash was placed, how changing rates and bank allocations were administered, and how compensation or economic value associated with the arrangement was allocated. Implicit in those documents was a duty to exercise that discretion in good faith and consistent with the purposes of the contractual arrangement.

94. Defendants instead exercised that discretion to suppress and maintain an artificially low and relatively nonresponsive bank-sweep rate while the FFR, SOFR, Treasury-bill and reverse-repo rates, comparable sweep programs, and TIAA's own managed and overflow categories reflected materially higher short-term cash returns. Defendants also automatically enrolled Plaintiff and Class members in the lower-yield BD Sweep Program even though higher-yielding money market fund options were available for eligible accounts.

95. In doing so, Defendants acted for their own financial benefit rather than for the purposes contemplated by the Program documents. They benefited from stable customer funding, the spread between Bank earnings and customer interest, and compensation associated with the sweep arrangement, while failing to disclose the magnitude of those economics. By automatically enrolling Plaintiff and Class members in the lower-yield BD Sweep Program despite available higher-yielding money market fund options and suppressing the rate, Defendants frustrated Plaintiff's and the Class's objectively reasonable expectations that a rate described as variable and subject to change would be administered in a manner responsive to relevant short-term rate conditions, and deprived Plaintiff and the Class of the benefit of their bargain.

96. As such, Defendants acted in bad faith and for their own financial benefit rather than for the purposes contemplated by the Program documents. In doing so, Defendants denied Plaintiff and the Class the full benefit of their bargain under the Program Documents, frustrated their objectively reasonable contractual expectations, and breached their good faith and fair dealing duties.

97. As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff and the Class sustained damages, including lost interest and other contract damages. Those damages may be determined from common rate histories, account records, and appropriate market, competitor, and TIAA internal comparisons, in an amount to be proven at trial.

## VII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Ordering Defendants to pay Plaintiff and the other Class members contract damages and damages for breach of the implied covenant, including lost interest, in an amount to be proven at trial and determined from the contractual rate disclosures, account records, rate histories, and appropriate evidentiary comparators alleged herein;

C. Declaring the rights and obligations of the parties under the Contract, applicable sweep terms, and rate disclosures, including the requirement that deposits of uninvested cash bear a reasonable rate of interest and that the disclosed variable-rate arrangement and contractual discretion be administered consistently with the purposes of those documents;

D. Ordering appropriate injunctive or equitable relief, to the extent available, prohibiting Defendants from administering the sweep products inconsistently with their disclosed rate terms, contractual duties, and the Custodial Agreement's reasonable-rate-of-interest requirement, including by exercising rate-setting and vehicle discretion in bad faith;

E. Ordering Defendants to pay pre- and post-judgment interest on any amounts awarded;

F. Ordering Defendants to pay attorneys' fees and costs of suit, to the extent authorized; and

G. Ordering such other and further relief under the two causes of action as may be just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 1, 2026

Respectfully submitted,

By: */s/ Omer Kremer*

**EDELSBERG LAW, P.A.**
Omer Kremer (*SDNY* # 5863477)
Gabriel Mandler (*pro hac vice* forthcoming)
Scott Edelsberg (*pro hac vice* forthcoming)
20900 NE 30th Ave, Suite 417
Aventura, FL 33180
Telephone: 786-289-9471
omer@edelsberglaw.com
gabriel@edelsberglaw.com
scott@edelsberglaw.com

Jason T. Dennett (*pro hac vice* forthcoming)
**MILBERG, PLLC**
1700 7th Avenue, Suite 2100
Seattle, WA 98101
Telephone: (516) 515-9124
jdennett@milberg.com

*Counsel for Plaintiff and the Proposed Class*